

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00289-CR

_____

TAYMOR TRAVON MCINTYRE, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from Criminal District Court No. 2
Tarrant County, Texas
Trial Court No. 1511547D

---

Before Sudderth, C.J.; Womack and Wallach, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

Appellant Taymor Travon McIntyre appeals his convictions for one count of murder and three counts of aggravated robbery with a deadly weapon, a firearm. In three issues, McIntyre argues that the trial court erred by not suppressing his videotaped statement that he made to officers. Specifically, McIntyre contends that (1) he never expressly waived his rights prior to speaking with the officers, (2) his statement to police was not made in a room exclusively designated as a juvenile processing office, and (3) his statement was involuntary. Because we conclude that it was not necessary for McIntyre to expressly waive his rights, that the room where the interrogation occurred satisfied the requirements of the Family Code, and that his statement was made voluntarily, we affirm.

## II. BACKGROUND

### A. Attempted Robbery and McIntyre's Detainment

McIntyre and several of his acquaintances devised a plot to rob a known drug house in July 2016. On the way to the robbery, the group rode in two separate cars. Two male members of the group brought handguns while another male brought a pair of brass knuckles. Once they arrived at the house, two of the girls—one of whom was dating the homeowner's son—went inside the house with the intention of relaying information to the remainder of the group via text messaging. Shortly after that, and because the homeowner's son had seen a third female participant waiting in

2

a vehicle outside, one of the two girls who had entered the home came back out and got the girl in the car. When the girls reentered the house, they purposely left the door unlocked. One of the girls also went and unlocked the garage door.

Later, several of the male participants, including McIntyre, entered the house with two of them brandishing the guns and yelling for everyone to get on the ground. McIntyre, who did not have a weapon, went into the living room and flipped over the couch where he was expecting to find drugs and money. Around the same time, one of the guys struck the homeowner's son in the face and then shot him. The son survived the shooting. At the same time, the other guy with a gun shot and killed another man in the house. Eventually all of the assailants fled the house in the two cars, but before they left, members of the group took a few watches and cell phones belonging to people in the house.

As police began to investigate the murder, they learned of McIntyre's role and obtained a warrant for his arrest. By early August, police had apprehended everyone in the group except McIntyre and another accomplice. On September 21, police received a tip regarding McIntyre and the accomplice's whereabouts, and the two were apprehended.

Because McIntyre was sixteen years old at the time and the accomplice was also a juvenile, police took them to the Mansfield Public Safety Building and arranged to have City of Mansfield Municipal Court Presiding Judge Erin Bakker read them their *Miranda* rights in accordance with Texas Family Code Section 51.095. *See* Tex. Fam.

Code Ann. § 51.095. Once in the building, officers placed McIntyre in one of four interview rooms, and they placed his accomplice in another room. Sergeants Tom Hewitt and James Vanduzi of the Mansfield Police Department joined McIntyre.

## B. McIntyre's Initial Contact with Hewitt and Vanduzi

After allowing McIntyre to go to the bathroom, Hewitt asked McIntyre for information on how to contact his parent or guardian.[1] Hewitt then retrieved a bottle of water and gave it to McIntyre, and after having learned that McIntyre had not eaten that day, Hewitt got a package of cheese crackers and gave it to McIntyre. During this time, Hewitt explained to McIntyre that before the officers could speak with him, he would need to be advised of his rights by a magistrate:

> SERGEANT HEWITT: Because of your age, sir, I can't speak with you without the judge talking to you first. Right?
>
> MR. McINTYRE: I know, but what is the judge going to, like, talk to me about?
>
> SERGEANT HEWITT: Well, the judge is going to go over why you're here and what your rights are.

---

[1]McIntyre initially said that he did not have parents and that he wished to speak with his road manager. McIntyre ultimately gave Hewitt a number purporting to be that of McIntyre's sister whom McIntyre indicated was his legal guardian. Later, as the officers interrogated McIntyre, they explained that they had contacted the person McIntyre said was his sister but learned that she was not. McIntyre explained that she was not his "biological" sister. The record is not clear regarding if McIntyre's parent or legal guardian was ever contacted.

## C. McIntyre's Initial Contact with Judge Bakker

A short time after this exchange, Hewitt left, and Judge Bakker entered the room.[2] Judge Bakker introduced herself and explained that she did not work for the police department and that, because McIntyre was a juvenile, a magistrate needed to advise him of his *Miranda* rights:

> So what the law says is, if police officers want to talk to someone under age, a magistrate or judge actually has to give them those warnings. Okay? So that's what I'm here to do today. Okay? So a couple of things. First, we're going to go over it, make sure you understand it. Okay? I'm going to go over the warnings one at a time.

McIntyre then asked to go to the bathroom, and he was allowed to go again.

Upon his return, Judge Bakker continued to explain her role to McIntyre:

> As you'll see in your rights we go over, it's your choice to talk to them or not. Once everything's over, I come back in and my job at that point is to make sure that you were treated appropriately, that nothing that wasn't supposed to happen happened, and that you understood everything that went on and that you don't have any questions and that everything that went on is voluntary.

Judge Bakker emphasized to McIntyre that she was there to make sure that he understood "what's going on and that you're treated the way you're entitled to be treated." She further explained that she had a written form that contained his rights and his charges, and that after he fully understood each right, she was going to have him initial each right to indicate that he understood them. Judge Bakker informed

---

[2]Vanduzi had already left the room and did not return until after Judge Bakker advised McIntyre of his rights.

McIntyre that he had been accused of or was a witness to the offense of capital murder. Using a "New Statutory Warning of Juvenile" form, Judge Bakker then proceeded to explain each of the Section 51.095 warnings[3] to McIntyre.

As to the first right, the following exchange occurred:

JUDGE BAKKER: First one, you may remain silent and not make any statement at all. Do you understand what that means?

MR. McINTYRE: Yes.

JUDGE BAKKER: What does that mean?

MR. McINTYRE: Basically, like, I don't have -- I don't have to say anything to anyone.

JUDGE BAKKER: Correct. Okay. Do you have any questions on that one, what it means?

MR. McINTYRE: Uh-huh.

---

[3]The rights as they are written on the form are:

- You may remain silent and not make any statement at all.

- Any statement you make may be used as evidence against you.

- You have the right to have an attorney present with you to advise you either before or during any questioning or interviews with peace officers or attorneys representing the State.

- If you are financially unable to employ an attorney, you have the right to have an attorney appointed for you to advise you before or during any questioning and/or interviews with peace officers or attorneys representing the State.

- You have the right to stop an interview or questioning at any time.

JUDGE BAKKER: You --

MR. McINTYRE: Can you explain it fully, like if --

JUDGE BAKKER: Do you have questions of me of what it means?

MR. McINTYRE: Uh-huh.

JUDGE BAKKER: Okay.  Go ahead.

MR. McINTYRE: Like, I don't have any questions.  I just want it to be explained.  You may remain silent and not make any statement at all, but I thought, like, I was called in here to make a statement.  Like, they told me that, like, I needed to -- that they were going to try to talk to me.  But, like, if I don't talk, what's the point of me, like, coming here?

JUDGE BAKKER: Well, I don't know, and I'm not involved in that part of what's going on.  All I can tell you is, like I said, since you're 16 and police officers want to talk to you -- in most -- in certain situations when police officers want to talk to people they may have to read them these rights.

MR. McINTYRE: All right.

JUDGE BAKKER: But since you're 16, I do it.

MR. McINTYRE: All right.  It's cool.

JUDGE BAKKER: As far as what happens after that, as far as what -- the choices you make, that -- that doesn't involve me.

MR. McINTYRE: All right.

JUDGE BAKKER: We just do this, and then I come back and make sure everything was okay and that you are okay.  Make sense?

MR. McINTYRE: Yeah.

JUDGE BAKKER: Okay.  Do you have any questions on the first one?

MR. McINTYRE: Huh-uh.

Judge Bakker then asked McIntyre if he would write his initials on the form next to the right that she had just explained. But McIntyre stated that he did not want to initial anything and their exchange continued, with Judge Bakker explaining McIntyre's next right to him:

> MR. McINTYRE: Can I have a phone call? I don't know what any of this means. I need to call my lawyer.
>
> JUDGE BAKKER: Okay. Let me -- let me go over these all with you, okay, and then I'll step out. Okay? I understand if you don't want to initial.
>
> MR. McINTYRE: But I don't know, like --, like, action and consequence to all of these, like --
>
> JUDGE BAKKER: Understood. Understood. Well, let me just go over and make sure you understand what they mean. Okay? The second one is any statement you make may be used as evidence against you.
>
> MR. McINTYRE: Uh-huh.
>
> JUDGE BAKKER: Do you know what that means?
>
> MR. McINTYRE: Yes.
>
> JUDGE BAKKER: Okay. You have the --
>
> MR. McINTYRE: It can be evidence for you or against you.
>
> JUDGE BAKKER: Correct.
>
> MR. McINTYRE: All right.

After telling a hypothetical about how evidence might be used against McIntyre, Judge Bakker went on to explain the remainder of McIntyre's rights:

> JUDGE BAKKER: Okay. You have the right to have an attorney present with you to advise you either before or during any questioning or interviews with

peace officers or attorneys representing the State of Texas. Do you understand what that means?

MR. McINTYRE: (Nods head.)

JUDGE BAKKER: What's another word for "attorney"?

MR. McINTYRE: Lawyer.

JUDGE BAKKER: There you go. If you are financially -- what does "financial" mean?

MR. McINTYRE: Like you can't afford it.

JUDGE BAKKER: Money, correct.

MR. McINTYRE: Yeah.

JUDGE BAKKER: If you are financially unable to employ an attorney, you have the right to have an attorney appointed for you to advise you before, during -- I'm sorry, before or during any questioning and/or interviews with peace officers -- that's another word for cops.

MR. McINTYRE: Uh-huh.

JUDGE BAKKER: You understand that? Okay. -- or attorneys representing the State of Texas. Do you understand that whole thing?

MR. McINTYRE: Uh-huh.

JUDGE BAKKER: Okay. And you have the right to stop an interview or questioning at any time. What I say on that is this: If you decide, I'm going to answer questions, that doesn't mean you have to answer every single question asked of you. Okay? That means you can say, Yeah, I'll answer those three questions, then say, No, I'm done. Or you can say, Yeah, I'll answer Question 1 and 5, but I don't want to touch 2, 3, and 4. That just because you say, I'll talk, doesn't mean --

MR. McINTYRE: And what --

JUDGE BAKKER: -- you have to keep talking.

9

MR. McINTYRE: And what happens, like --

JUDGE BAKKER: What?

MR. McINTYRE: -- about the questions that I don't answer.

JUDGE BAKKER: You just don't answer them.

MR. McINTYRE: Uh-huh.

JUDGE BAKKER: That's your right. Okay? Do you feel like you understand these?

MR. McINTYRE: Yeah, but I still feel like I need, like, an adult present.

JUDGE BAKKER: Okay. I understand that.

MR. McINTYRE: One that, like -- a comfortable adult that I'm comfortable with.

JUDGE BAKKER: I understand. I get that. I just need to make sure what -- just right here this part --

MR. McINTYRE: Oh, this is all -- I understood every single one of these --

JUDGE BAKKER: Okay.

MR. McINTYRE: -- rules.

JUDGE BAKKER: Okay. Would you --

MR. McINTYRE: So I just sign it?

JUDGE BAKKER: Would you -- would you put your initial on each line for me, please?

MR. McINTYRE: (Complies.)

After Judge Bakker and McIntyre both signed the bottom of the form, she informed him that officers would now come in to talk with him and that she would be back when they were finished speaking to him. Then Judge Bakker asked McIntyre whether he had any more questions of her. McIntyre said, "Yes -- I mean no." Judge Bakker then left the room.

## D. Hewitt and Vanduzi Interrogate McIntyre

After Judge Bakker left, Hewitt and Vanduzi entered the room. Hewitt asked McIntyre whether he needed more water, and he said, "I'm good." Hewitt explained to McIntyre that they knew of his involvement in a crime and that the officers were there to get McIntyre's side of the story. As this conversation between Hewitt and McIntyre continued, Hewitt never mentioned the exact charges he was discussing with McIntyre. At one point, the following transpired:

MR. McINTYRE: Are you accusing me of capital murder?

SERGEANT HEWITT: Am I acc- -- no. That -- you need to listen --

MR. McINTYRE: Because that's what it says on the paper. I'm just putting --

SERGEANT HEWITT: Exactly.

MR. McINTYRE: -- two and two together like --

Hewitt continued to explain to McIntyre that the officers wanted his story of what had happened, that the investigation had already revealed McIntyre's involvement in the robbery, and that others involved had been "pointing the finger" at McIntyre. Hewitt also discussed his inability to contact a relative with a number

11

McIntyre had given him earlier.  At one moment, McIntyre asked Hewitt if he could make a phone call, to which Hewitt responded:

> You can talk to me.  You can either talk to me or not.  Here -- but I'm telling you, [McIntyre], you don't have to talk to me, Bud, but if you don't clear up your side of it, all we got is what everybody else said you did, and all we got is the evidence showing that you were there, and that's enough.

As the interrogation continued, McIntyre's version of his involvement changed. At first, McIntyre insisted that he was only in the car outside and that he never went into the house with the other assailants.  Hewitt accused McIntyre of not telling the truth and asked, "Why don't you tell me?"  McIntyre responded, "Because I've been in this situation. I was proven innocent."  At one point in the interview, McIntyre asserted his right not to answer questions about others involved in the attempted robbery:  "Actually, I just -- I think I'm going to choose not to answer that question, if that's okay with you."  Hewitt responded, "That's fine with me."  McIntyre then agreed that he had gone inside the house during the attempted robbery.

Later, McIntyre again asserted his right to not answer certain questions when he told Hewitt that he was going to "pass on that question."  When Hewitt indicated that McIntyre could not pass on the questions, McIntyre responded, "Yes I do.  Read

the paper, Bro. Is that the paper? Read it. I'll read it for you."[4] And then later, McIntyre asserted, "Don't ask me any questions if they aren't about me, Bro."

**E. Judge Bakker Returns to Speak with McIntyre**

Eventually, Hewitt and Vanduzi left the interview room, and Judge Bakker returned. After acknowledging that McIntyre had not made a written statement, she crossed out that section of the form and had McIntyre initial each corner of the page. Judge Bakker then asked some follow-up questions about McIntyre himself, including whether he could read and write in English, whether he was a U.S. citizen, what grade he should be in, and what was his favorite subject.

At one point, Judge Bakker asked McIntyre whether he was under the influence of any drugs or alcohol, to which McIntyre said that he had smoked "weed this morning." The following exchange occurred:

JUDGE BAKKER: Okay. But -- okay. Take a look at me for one second.

MR. McINTYRE: (Complies.)

JUDGE BAKKER: Okay. You don't look to be high to me right now. Are you?

MR. McINTYRE: Am I high right now?

JUDGE BAKKER: Yeah.

MR. McINTYRE: Yes.

---

[4]It is not clear from the video whether Hewitt had the form that Judge Bakker and McIntyre had signed, but Hewitt did have what appeared to be a file with him containing a number of documents.

JUDGE BAKKER: You're high?

MR. McINTYRE: Yes.

JUDGE BAKKER: On what?

MR. McINTYRE: Weed.

JUDGE BAKKER: Okay.  When did you smoke it?

MR. McINTYRE: Like, an hour ago.

JUDGE BAKKER: Okay.  Well, you've been here for two and a half hours, so did you smoke it in here?

MR. McINTYRE: Huh-uh.

JUDGE BAKKER: Okay.

MR. McINTYRE: I smoked it in the car before I came.

JUDGE BAKKER: In your car?

MR. McINTYRE: It wasn't mine.

JUDGE BAKKER: Okay.  But not in a police car?

MR. McINTYRE: Oh, no, not a police car.

Judge Bakker then asked whether the officers had forced him to do anything while they interrogated him and whether they had deprived him of anything. McIntyre answered no to both questions.  He acknowledged that the officers had allowed him to go to the bathroom when he needed and that neither of them had offered him a bribe.  He also stated that he still understood the warnings Judge Bakker had given him prior to the interrogation, and he affirmed that everything done

14

in the interrogation was done "voluntarily, of [his] own free will." Judge Bakker and McIntyre then signed the bottom of the form, Judge Bakker confirmed he had no more questions for her, and she left the interview room.

After Judge Bakker left the room, Hewitt came back in the room and asked whether McIntyre needed anything or needed to go to the bathroom. McIntyre said, "No." Shortly after, as Hewitt explained that McIntyre and his accomplice were "fixing to head out," he again asked if McIntyre needed anything. McIntyre requested to again go to the bathroom, and Hewitt allowed him to do so.

## F. McIntyre Absconds and His Case is Transferred to Criminal District Court

After the interview, officers placed McIntyre in the custody of Tarrant County Juvenile Services who had received a referral indicating that McIntyre had engaged in delinquent conduct by committing the offenses of capital murder and aggravated robbery. The State later instituted a juvenile delinquency proceeding. On January 5, 2017, McIntyre was released from the juvenile detention facility to the custody of his sister. As a condition of his release, McIntyre was required to wear an electronic monitoring device. On March 27, 2017, juvenile services received notice that McIntyre had cut off the monitoring device. On June 30, 2017, the United States Marshals Service in Union County, New Jersey apprehended McIntyre, and he was returned to the custody of Tarrant County Juvenile Services.

On July 5, 2017, Tarrant County Juvenile Services received another referral indicating that McIntyre had engaged in delinquent conduct by committing the

offense of aggravated robbery in an unrelated incident. Eventually, McIntyre was transferred to the custody of the Tarrant County Sheriff and placed in jail.

Based on the State's transfer petition, on August 30, 2017, the juvenile court waived its exclusive jurisdiction over McIntyre and transferred him to Tarrant County Criminal District Court Number Two. On August 31, the Criminal District Court accepted the transfer. Ultimately, the State charged McIntyre with one count of capital murder and three counts of aggravated robbery in connection with the home invasion.

## G. The Suppression Hearing

Prior to trial, McIntyre moved to have his recorded statement to the officers suppressed. The trial court held a hearing.

### 1. Judge Bakker's Testimony

Judge Bakker testified that she was the magistrate that gave McIntyre the Section 51.095 warnings. After explaining her routine practices in administering the warnings, Judge Bakker described specifically what she recalled about having given McIntyre the warnings.

According to Judge Bakker, after sitting down with McIntyre in the interview room, she took note that McIntyre spoke English, did not seem upset, and lacked any observable mental incapacities. She also said that McIntyre used a vocabulary consistent with a sixteen year old, he was respectful and polite, and he "seemed to communicate with [her] effectively." Judge Bakker further stated that she saw

16

nothing to indicate that McIntyre was intoxicated in any manner and that she had no concerns about proceeding with reviewing the warnings with McIntyre at that time.

As she began to cover the warnings with McIntyre, Judge Bakker first read the paragraph of the warning form which indicated that McIntyre had been either accused of or was a witness to the offense of capital murder. Judge Bakker said that she then explained to McIntyre that she was going to go over the statutory warnings one at a time to make sure he understood them and to answer any questions he might have about them.

By Judge Bakker's account, McIntyre asked and was allowed to go to the bathroom before she read the warnings. After he returned, Judge Bakker said she pulled her chair near McIntyre's so that they could review the written warnings together, and from there, Judge Bakker began to read the warnings one at a time.

Judge Bakker said that at the end of reading the warnings to McIntyre, he acknowledged understanding the rights that she had read to him, and he initialed each of the warnings on the form. According to Judge Bakker, she had no concerns about whether McIntyre understood the warnings, and if she had, she would not have allowed an interview to go forward. After McIntyre acknowledged that he understood the rights, Judge Bakker then informed McIntyre that when he had finished speaking with the officers, she would return and speak with him to ensure that he had not been mistreated.

17

Judge Bakker acknowledged that, as she began to read him his rights, McIntyre asked about a lawyer, but Judge Bakker interpreted McIntyre's question to be an inquiry into whether she was a police officer or whether he needed an attorney to explain his rights to him. According to Judge Bakker, once she explained that her purpose was to make sure he understood his rights, McIntyre said, "[O]h, okay, yeah, yeah, I'm with you." Judge Bakker stated that once McIntyre understood that she was not there to ask about an alleged offense, McIntyre agreed to "go forward going through all [the form's] information." Judge Bakker said that McIntyre never mentioned a lawyer to her again.

After officers were finished interviewing McIntyre, Judge Bakker returned to the room and went over the remainder of the form with him, as she had told him she would. Upon her return, Judge Bakker noticed that McIntyre had not given a written statement on the form, so she crossed through the pages applicable to written statements, and he initialed each page she had marked out. She also reviewed and filled out the post-interview portion of the form with McIntyre. As she did, she began asking McIntyre questions from the form. For example, Judge Bakker asked McIntyre what grade he was in and what his hobbies were. She wrote his answers on the form. Judge Bakker also asked McIntyre whether he was intoxicated or under the influence of drugs, and McIntyre said that he had smoked marijuana in the car prior to the police having detained him. But Judge Bakker said that McIntyre did not appear to be intoxicated to her.

Additionally, Judge Bakker asked McIntyre whether he had made his verbal statements to the officers freely and voluntarily, whether the officers had mistreated or threatened him, and whether the officers had deprived McIntyre of food or drink. Judge Bakker said that, through her questions and observations, she believed that McIntyre understood his rights before and after speaking with the officers, and that in her opinion, all of McIntyre's actions "were knowing and voluntary." Judge Bakker testified that both her interactions with McIntyre as well as McIntyre's interview with the officers were captured and recorded on video. But Judge Bakker admitted that even though she had the authority under the Family Code to request to watch the portion of the video where the officers interviewed McIntyre, she chose not to do so and thus did not know what happened during the time McIntyre was actually interviewed by police.

During cross-examination, defense counsel asked Judge Bakker whether she had ever asked McIntyre if he agreed to waive the rights she had read to him, and Judge Bakker responded, "No." Defense counsel then asked whether Judge Bakker agreed that there was no "express[] waiver" by McIntyre. Judge Bakker said,

> Again, I'm not trying to be cagy, but that's not what I'm there to judge. I mean, I explained his rights to him. The word "express waiver" is your term. It's also a term of art and a term of law. I believe he understood his rights and I believe that what he did was knowing and voluntary.

19

## 2. Detective Patrick Knotts's Testimony

Detective Patrick Knotts of the Mansfield Police Department testified at the suppression hearing as well. According to Knotts, he served as the lead detective in the investigation of McIntyre's involvement in the attempted robbery and resulting murder. Knotts said that officers arrested McIntyre in Arlington on September 21 and transported him to an interview room at the Public Safety Building in Mansfield, which, according to Knotts, is a designated juvenile processing facility by local agreement with Tarrant County. Knotts testified that the Public Safety Building has four interview rooms that are equipped with video and audio recording equipment and that these rooms were used for multiple purposes including interviewing arrestees—both adults and juveniles—as well as victims: "It could be any number [of] reasons [the rooms] can be used." By Knott's account, he placed McIntyre in room number four, and he placed McIntyre's accomplice in a room across the hall. Knotts said that Hewitt and Vanduzi interviewed McIntyre while he interviewed the other suspect.

Knotts averred that, because of Mansfield Police Department policy and the law, he never allows juveniles who are in custody to "comingle" with adults who are in custody. According to Knotts, they are housed and detained in separate rooms at the facility. Knotts explained the reasoning behind this policy:

> [I]t's important any time that you have a juvenile in custody that they have to remain separate from any adult prisoner, any adult suspect as well. So even if you have a juvenile and adult say they're involved in the

same criminal episode, you would still separate them when you're doing any investigation or interviews or something like that once they come into your custody.

At the hearing, the defense introduced the video recording of the officers' interview with McIntyre as well as his interactions with Judge Bakker. The defense also introduced a transcript of the entire video. The trial court noted on the record that it had watched the video and read the transcript. Ultimately, the trial court denied McIntyre's suppression motion. In its order denying the motion, the trial court made findings of fact and conclusions of law.

## H. The Verdict and Sentencing

Later, a jury trial was held. At the beginning of trial, McIntyre pleaded not guilty to capital murder and aggravated robbery causing bodily injury by shooting with a firearm. McIntyre pleaded guilty to two counts of aggravated robbery by threatening with a firearm. At trial, McIntyre's recorded statement was played for the jury. The jury found McIntyre guilty of the lesser-included offense of murder and guilty of aggravated robbery causing bodily injury by shooting with a firearm. After the punishment phase of trial, the jury assessed punishment at fifty-five years' incarceration for the murder conviction, thirty years' incarceration for one of the aggravated robbery convictions, and thirteen years' incarceration for each of the remaining two convictions. The trial court rendered judgments accordingly, ordering McIntyre's sentences to run concurrently, and this appeal followed.

21

## III. DISCUSSION

All three of McIntyre's issues contend that the trial court erred by denying his motion to suppress. Thus, we will first set out the proper standard of review and then address his issues in turn.

### A. Standard of Review

We review a trial court's ruling on a motion to suppress the statement of a juvenile under the same abuse of discretion standard as a motion to suppress the statement of an adult in a criminal proceeding. *See Balentine v. State*, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002); *In re J.A.B.*, 281 S.W.3d 62, 65 (Tex. App.—El Paso 2008, no pet.). We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of the witnesses' credibility and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007). Therefore, we defer almost totally to the trial court's rulings on (1) questions of historical fact, even if the trial court determined those facts on a basis other than evaluating credibility and demeanor, and (2) application-of-law-to-fact questions that turn on evaluating credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09

22

(Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the witnesses' credibility and demeanor, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53.

Stated another way, when reviewing the trial court's ruling on a suppression motion, we must view the evidence in the light most favorable to the ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those findings. *Kelly*, 204 S.W.3d at 818–19. We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id.* at 818.

## B. Express Waiver of Rights

In his first issue, McIntyre argues that "[t]he trial court erred in denying [McIntyre's] motion to suppress his recorded oral statement and admitting the same at trial over his objection because the requirements of Texas Family Code Section 51.095 were not strictly complied with in that neither the police, nor the magistrate, ever requested or obtained an express waiver of [McIntyre's] rights prior to custodial interrogation." The State argues that the trial court properly denied McIntyre's motion to suppress his statement because Section 51.095 does not require an express

waiver and that both law enforcement and Judge Bakker strictly followed Section 51.095. We agree with the State.

## 1. Relevant Statutes and Cases

The language in Section 51.095 of the Family Code is substantially the same as that contained in Article 38.22 of the Code of Criminal Procedure with the exception that the Family Code requires that a magistrate administer the warnings to a juvenile. Section 51.095(a)(5)(A) of the Family Code provides that the statement of a child made while in custody is admissible if:

> (5) the statement is made orally [while the child is in custody of an officer] and the statement is recorded by an electronic recording device, including a device that records images, and:
>
> > (A) before making the statement, the child is given the warning described by Subdivision (1)(A) by a magistrate, the warning is a part of the recording, and the child knowingly, intelligently, and voluntarily waives each right stated in the warning.

Tex. Fam. Code Ann. § 51.095(a)(5)(A).[5]

---

[5]The warnings required to be given by Section 51.095(a)(1)(A) are as follows:

(i) the child may remain silent and not make any statement at all and that any statement that the child makes may be used in evidence against the child;

(ii) the child has the right to have an attorney present to advise the child either prior to any questioning or during the questioning;

(iii) if the child is unable to employ an attorney, the child has the right to have an attorney appointed to counsel with the child before or during any interviews with peace officers or attorneys representing the state; and

(iv) the child has the right to terminate the interview at any time.

24

Article 38.22, section 3(a) of the Texas Code of Criminal Procedure provides that no oral statement of an adult accused of an offense shall be admissible unless "prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning."[6] Tex. Code Crim. Proc. Ann. art. 38.22, § 2(a). The Court of Criminal Appeals has determined that Article 38.22 does not require an express waiver of rights. *Rocha v. State*, 16 S.W.3d 1, 12 (Tex. Crim. App. 2000).

Recognizing the consistency in language between these statutes, a number of Texas appellate courts have held that there is no requirement that a juvenile explicitly

---

Tex. Fam. Code Ann. § 51.095(a)(1)(A).

[6]Article 38.22, Section 2(a)'s warnings are:

(1) [A suspect] has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;

(2) any statement he makes may be used as evidence against him in court;

(3) he has the right to have a lawyer present to advise him prior to and during any questioning;

(4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and

(5) he has the right to terminate the interview at any time.

Tex. Code. Crim Proc. Ann. art. 38.22 § 2(a).

or expressly waive his rights pursuant to Section 51.095 of the Family Code, just as an adult is not required to expressly waive his rights pursuant to Article 38.22 of the Code of Criminal Procedure. *See Coby v. State*, No. 01-18-00991-CR, 2020 WL 3867280, at *7 (Tex. App.—Houston [1st Dist.] July 9, 2020, no pet.) (mem. op., not designated for publication) ("The Family Code does not require that the defendant explicitly waive his rights.") (citing *Marsh v. State*, 140 S.W.3d 901, 911 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd)); *In re C.M.*, No. 10-10-00421-CV, 2012 WL 579540, at *7 (Tex. App.—Waco Feb. 22, 2012, no pet.) (mem. op.) ("[T]here is no requirement that a juvenile explicitly waive his rights pursuant to section 51.095 of the Family Code or article 38.22 of the Code of Criminal Procedure."); *Crenshaw v. State*, No. 01-09-00791-CR, 2011 WL 286126, at *11 (Tex. App.—Houston [1st Dist.] Jan. 27, 2011, pet. ref'd) (mem. op., not designated for publication) (holding that there is no requirement that a juvenile explicitly waive his Section 51.095 rights); *In re J.L.*, No. 10-06-00246-CV, 2007 WL 3298920, at *5 (Tex. App.—Waco Nov. 7, 2007, no pet.) (mem. op.) ("Section 51.095(a)(5)(A) does not require that every right be individually waived either in writing or verbally, but only that the juvenile knowingly, intelligently and voluntarily waive[s] each right."). Rather, an implicit waiver can be inferred from the actions and words of the person being interrogated. *See Joseph v. State*, 309 S.W.3d 20, 25 (Tex. Crim. App. 2010) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S. Ct. 1755, 1760 (1979)).[7]

---

[7]Given the nature of McIntyre's first and third issues, we will address the

## 2. Analysis

In this case, it is undisputed that McIntyre never expressly waived the rights that Judge Bakker had informed him about. And even though McIntyre "concedes that the [requirement of an express waiver] is not the current state of the law," he nonetheless contends that "strict compliance" with Section 51.095 is required. He goes on to define "strict compliance" as necessitating an express waiver even though no such language is present in Section 51.095.

To support his argument, McIntyre cites cases where courts have expressed that strict compliance with Section 51.095 is required. But these cases do not support the position that the rights in that section be expressly waived. *In re Matter D.J.C.*, 312 S.W.3d 704, 720–21 (Tex. App.—Houston [1st Dist.] 2009, no pet.); *In re J.B.J.*, 86 S.W.3d 810, 815 (Tex. App.—Beaumont 2002, no pet.). Indeed, in *D.J.C.*, the magistrate failed to warn the juvenile that his video-recorded statement could be used in evidence against him even though Section 51.095 expressly requires that the magistrate inform a juvenile of that right. 312 S.W.3d at 719. And in *J.B.J*, the court held that officers had strictly complied with the parental-notification provisions of the Family Code—waiver was not at issue. 86 S.W.3d at 815. In short, these cases do not support McIntyre's position that strict compliance with Section 51.095 requires an express waiver of rights by the juvenile.

---

voluntary nature of McIntyre's statement in our analysis of his third issue.

27

McIntyre also attempts to distinguish the cases of *Marsh*, *C.M.*, *Crenshaw*, and *J.L.* (cases relied on by the State at the suppression hearing and cited by the trial court in its findings of fact and conclusions of law) from his case, arguing that the juvenile defendants in those cases all made overt acts that constituted an express waiver. For example, McIntyre points out that in *Marsh*, Marsh had "expressed a willingness to make a written or recorded statement." 140 S.W.3d at 905. For *C.M.*, McIntyre contends that C.M. made an express waiver of his rights when he stated that "he understood those rights and answered affirmatively when the magistrate asked him if he still wanted to talk to the detectives." 2012 WL 579540, at *8. McIntyre distinguishes *Crenshaw* from an implied-waiver case by drawing attention to the fact that after being warned of his Section 51.095 rights, Crenshaw simply began telling his side of the story without any instigation from the police. 2011 WL 286126, at *11. And McIntyre differentiates *J.L.* because J.L. responded to the magistrate's comment that he did not have to make a statement by circling "I DO" on the form informing him of his rights. 2007 WL 3298920, at *1. While it is true that there are factual differences in these cases that distinguish them from McIntyre's case, each of these cases stand for the proposition that an express waiver is not required under Section 51.095. *See id.*; *Marsh*, 140 S.W.3d at 905; *C.M.*, 2012 WL 579540, at *8; *Crenshaw*, 2011 WL 286126, at *11. Notably, McIntyre points to no provision of Section 51.095 that Judge Bakker failed to strictly follow. We conclude that these cases undercut McIntyre's position that an express waiver is required.

28

Even though McIntyre admits that case law in Texas is contrary to his position, McIntyre ultimately asks this court to set a bright-line rule that a juvenile must expressly waive his Section 51.095 rights. But McIntyre again simply makes the argument that the edicts of the Family Code should be strictly complied with—he does not point to any authority suggesting why we should hold contrary to established law that no express waiver is required. *See Marsh*, 140 S.W.3d at 911; *see also C.M.*, 2012 WL 579540 at *7 ("[T]here is no requirement that a juvenile explicitly waive his rights pursuant to section 51.095 of the Family Code or article 38.22 of the Code of Criminal Procedure.").

We conclude, as other courts have, that there is no requirement of an express waiver of the rights articulated in Section 51.095(a)(5)(A). Thus, the trial court did not err by denying McIntyre's motion to suppress his statement based on the lack of an express waiver. *See Marsh*, 140 S.W.3d at 911 (construing Section 51.095 consistently with Article 38.22 and holding that neither statute requires an express waiver). We overrule McIntyre's first issue.

## C. Designated Juvenile Processing Office

In his second issue, McIntyre argues that the trial court erred by not suppressing his statement because his statement was obtained in a room not exclusively used for interviewing children in violation of Family Code Section 52.025(a). Tex. Fam. Code Ann. § 52.025(a). The State counters that McIntyre was interviewed in a room exclusively designated as a juvenile processing office and that

29

the area was exclusively used for that purpose at the time; thus, the trial court did not err by concluding that the location of the interview did not violate Section 52.025(a). The State also argues, in the alternative, that even if the interview room did not meet the necessary standard of a juvenile processing office, McIntyre has failed to show a causal connection between the making of his statement and the failure of the interview room to be used exclusively as a juvenile processing office. Again, we agree with the State.

The Texas Family Code sets out detailed procedures for the detainment and arrest of juveniles accused of delinquency, and police officers and courts are bound to comply with those procedures. Tex. Fam. Code Ann. §§ 52.01–52.026; *In re D.Z.*, 869 S.W.2d 561, 564 (Tex. App.—Corpus Christi 1993, writ denied). Efforts at compliance with the requirements of the Family Code have been closely scrutinized by Texas courts in the past. *See, e.g., Roquemore v. State*, 60 S.W.3d 862, 871 (Tex. Crim. App. 2001); *In re R.R.*, 931 S.W.2d 11, 13–14 (Tex. App.—Corpus Christi 1996, no writ); *In re D.Z.*, 869 S.W.2d at 563–65. As a general rule, violations of the Family Code will render evidence subsequently obtained from the juvenile inadmissible. Tex. Fam. Code Ann. § 54.03(e).

Section 52.02 provides that a person taking a child into custody must immediately bring that child to a designated juvenile processing office or to one of several listed alternative sites. *Id.* § 52.02; *see Anthony v. State*, 954 S.W.2d 132, 136

(Tex. App.—San Antonio 1997, no pet.) ("The police station must use an area designated exclusively for processing juveniles."). Section 52.025(a) states,

> The juvenile board may designate an office or a room, which may be located in a police facility or sheriff's offices, as the juvenile processing office for the temporary detention of a child taken into custody under Section 52.01. The office may not be a cell or holding facility used for detentions other than detentions under this section. The juvenile board by written order may prescribe the conditions of the designation and limit the activities that may occur in the office during the temporary detention.

Tex. Fam. Code Ann. § 52.025(a). The purpose for requiring juveniles to be interrogated in specially designated areas is to protect them from exposure to adult offenders and the stigma of criminality. *Williams v. State*, 995 S.W.2d 754, 758 (Tex. App.—San Antonio 1999, no pet.).

But a designated juvenile processing office does not need to be exclusively used for juveniles to satisfy Section 52.025 so long as juveniles and adults are not interviewed in the designated office or room at the same time. *Id.* In *Williams*, an officer suspected that Williams, a juvenile, was involved in a murder. *Id.* Upon learning that Williams had been detained in jail under his brother's name, the officer went to the jail and asked Williams whether he would be willing to give a statement concerning what happened on the night of the murder. *Id.* Williams agreed and was released to the officer's custody. *Id.* The officer took Williams directly to a magistrate's office, and the magistrate informed him of his rights and gave him the warnings required by the Family Code. *Id.*; *see* Tex. Fam. Code Ann. § 51.095(a)(1)(A).

31

When the magistrate finished with this procedure, the officer took Williams to the Youth Crimes Bureau of the local police department. *Williams*, 995 S.W.2d at 758. As a result of ongoing remodeling, no interview rooms were available at the Youth Crimes Bureau. *Id.* Thus, the officer took Williams to the homicide office, where Williams gave his statement. *Id.* The officer testified that the office was vacant except for himself and Williams. *Id.* No adult offenders were present. *Id.* After the statement was completed, the officer took Williams back to the magistrate, Williams signed the statement in the magistrate's presence, and the magistrate certified that the statutory requirements had been satisfied and that the statement was made voluntarily. *Id.* Williams's statement was later introduced at his murder trial. *Id.* at 756.

On appeal, Williams argued that his statement should not have been admitted at trial because he made his statement in a room that was not used exclusively to interview juveniles and thus it did not meet the statutory definition of Section 52.025. *Id.* at 758. The *Williams* court reasoned that because no one else was in the homicide office at the time Williams made his statement, the purposes of protecting juveniles from exposure to adult offenders and the stigma of criminality had been fulfilled. *Id.* According to the *Williams* court, "To hold that Williams's statement was inadmissible under these circumstances would be to place form above substance." *Id.* at 758–59.

The court held that Williams's statement was properly admitted at trial even though the homicide office was not exclusively used to interview juveniles.[8] *Id.*

The facts of this case are substantially similar to the facts in *Williams*, and we conclude that the same resolution is proper. Like in *Williams*, officers brought McIntyre to an interview room that Knotts testified was used for many purposes including interviewing both juveniles and adults. And similar to *Williams*, there were no adult offenders present when McIntyre gave his statement to the officers. Indeed, Knotts testified that it was both the law and Mansfield Police Department policy to keep juveniles and adults separate. Moreover, like in *Williams*, McIntyre was informed of his rights by Judge Bakker before he spoke with the officers. After McIntyre made his verbal statement to the officers, Judge Bakker returned to the interview room and

---

[8]The State has identified two cases—*In re D.J.C.* and *Anthony*—that could be interpreted to indicate that Section 52.025 requires that the juvenile processing office be reserved exclusively for that purpose, but we agree with the State's position that these cases are distinguishable from McIntyre's. *See In re D.J.C.*, 312 S.W.3d 704, 718 (Tex. App.—Houston [1st Dist.] 2009, no pet.) ("The evidence shows that the interview room used by Officer Garcia was 'used routinely to interview all criminal subjects.'"); *Anthony*, 954 S.W.2d at 136 ("The police station must use an area designated exclusively for processing juveniles."). In both of those cases, there was evidence that the juveniles were not taken to a juvenile processing facility, and there was no evidence that the facilities were used exclusively as juvenile processing offices *at the time* the interviews transpired. *D.J.C.*, 312 S.W.3d at 718; *Anthony*, 954 S.W.2d at 136. Here, McIntyre was taken to a designated juvenile processing facility, and Knotts testified that it was exclusively used for that purpose *at the time* McIntyre was interrogated. Furthermore, the San Antonio Court of Appeals later distinguished *Anthony* from its decision in *Williams* specifically "[b]ecause no one else was in the homicide office *at the time* Williams made his statement." *Williams*, 995 S.W.2d at 758–59 (emphasis added).

33

certified that the statutory requirements had been satisfied and that McIntyre's statement was voluntary. Because, like in *Williams*, McIntyre was not exposed to adult offenders and the stigma of criminality, we hold that, under these circumstances, it would be placing form over substance to conclude that McIntyre's statement was inadmissible simply because at other times the room in which he was interrogated was used for other purposes, including interviewing adult offenders.[9]

Furthermore, this case demonstrates how impractical it would be to interpret Section 52.025 as requiring that juvenile processing offices be reserved exclusively for that purpose at all times. As the State points out, the juvenile holding log for the Mansfield Police Department, which McIntyre introduced at the suppression hearing, demonstrates that only sixteen juveniles were interviewed at that building over the course of three years and three months. Those interviews in total lasted approximately six hours. Thus, to elevate form over substance and require juvenile

---

[9]We decline McIntyre's invitation to "remand this matter to the trial court" to make additional conclusions of law indicating that the lack of exclusivity of the room had no impact on his statement because even if the trial court had given a wrong reason for its ruling, we would uphold the ruling if it is both supported by the record and correct under any applicable legal theory. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007); *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003). Our conclusion that designated juvenile processing offices do not need to be exclusively used for juveniles to satisfy Section 52.025 so long as juveniles and adults are not interviewed in the designated office or room at the same time is an applicable legal theory in this case, and it is supported by the record. We do note that the trial court specifically found that the interrogation was conducted "in an interview room designated for juvenile interviews in addition to adult, child, witness, and victim interviews."

processing offices to be reserved exclusively for that purpose at all times would mean

that the Mansfield Police Department would be required to keep multiple interview

rooms vacant year-round when they would only be used an average of two hours per

year. We hold that the trial court did not err by not suppressing McIntyre's statement

because of where he gave the statement.[10] We overrule McIntyre's second issue.

---

[10]There is another, independent reason why—one urged by the State—the trial court did not err by refusing to suppress McIntyre's statement—McIntyre has not shown a causal connection between any alleged Family Code violation and the making of his statement. *See Gonzales v. State*, 67 S.W.3d 910, 912 (Tex. Crim. App. 2002). In order for a juvenile's written statement to be suppressed because of a violation of Section 52.025, there must be some "exclusionary mechanism." *Id.* Unlike Section 51.095, Section 52.025 is not an independent exclusionary statute. Section 51.17 of the Family Code provides that "Chapter 38, Code of Criminal Procedure, appl[ies] in a judicial proceeding under this title." Tex. Fam. Code. Ann. § 51.17(c). Thus, if evidence is to be excluded because of a Section 52.025 violation, it must be excluded through the operation of Article 38.23(a) of the Code of Criminal Procedure. *See Gonzales*, 67 S.W.3d at 912 (holding that Article 38.23(a) governs admissibility of evidence gained through a violation of a non-exclusionary Family Code provision).

Article 38.23(a) provides that "[n]o evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas . . . shall be admitted in evidence." Tex. Code Crim. Proc. Ann. art. 38.23. The Texas Court of Criminal Appeals has consistently held that evidence is not "obtained . . . in violation" of a provision of law if there is no causal connection between the illegal conduct and the acquisition of the evidence. *Gonzales*, S.W.3d at 912; *Roquemore v. State*, 60 S.W.3d 862, 869 (Tex. Crim. App. 2001); *Chavez v. State*, 9 S.W.3d 817, 820 (Tex. Crim. App. 2000). In light of Article 38.23(a), before a juvenile's statement can be excluded, there must be a causal connection between the Family Code violation and the making of the statement. *Gonzales*, S.W.3d at 912; *Pham v. State*, 175 S.W.3d 767, 773 (Tex. Crim. App. 2005). The burden of proof is on the party asserting the exclusion of evidence. *Pham*, 175 S.W.3d at 773.

In this case, McIntyre has not even argued that there is a causal connection between the alleged violation that his interrogation was not conducted in a proper juvenile processing office and the fact that he gave his statement to the officers. And

## D. The Voluntariness of McIntyre's Statement

In his third issue, McIntyre argues that the trial court erred by not suppressing his statement because, when considering the totality of the circumstances, it was involuntarily made. Specifically, McIntyre argues that a number of facts demonstrate that his statement was not given voluntarily. McIntyre concedes that he was neither threatened nor promised anything in exchange for his statement. The State contends that, when viewing the evidence in a light favorable to the trial court's ruling, McIntyre's statement was voluntarily made.

"The statement of an accused may be used in evidence against him if it appears that it was freely and voluntarily made without compulsion or persuasion[.] 'The determination of whether a confession is voluntary is based on an examination of the totality of circumstances surrounding its acquisition.'" *Wyatt v. State*, 23 S.W.3d 18, 23 (Tex. Crim. App. 2000) (quoting *Penry v. State*, 903 S.W.2d 715, 744 (Tex. Crim. App. 1995)). Further, on appeal, the appellate court does not engage in its own factual review but decides whether the trial judge's fact findings are supported by the record. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990). Trial courts are given almost complete deference in determining historical facts. *St. George v. State*,

this court has read the transcript of and watched the video of McIntyre's statement as he made it to the police. Nothing in the record before us, or McIntyre's arguments in his brief to this court, suggests that McIntyre, or his decision to make his statement to police, was affected by the use of the interview room. Because McIntyre has not shown this causal connection, he has failed to show how the trial court erred by not suppressing his statement. *See Gonzales*, S.W.3d at 912.

237 S.W.3d 720, 725 (Tex. Crim. App. 2007). If the trial court's findings of fact are supported by the record, an appellate court is not at liberty to disturb them; thus, we address only the question of whether the trial court improperly applied the law to the facts. *Id.*

It is notable that during the interrogation, McIntyre demonstrated an awareness of his rights. Specifically, at multiple times during the interrogation McIntyre chose not to answer certain questions. For example, at one moment in the interrogation he asserted, "Actually, I just -- I think I'm going to choose not to answer that question, if that's okay with you." Later, he told Hewitt that he was going to "pass on that question." Furthermore, he responded to a line of questioning by stating, "Don't ask me any questions if they aren't about me, Bro." McIntyre even explained to Hewitt that he understood his right not to answer certain questions, that he knew that the right was expressed on the form he signed, and that he was willing to read the form to Hewitt. This is significant because Judge Bakker had explained to McIntyre that as part of his right to remain silent and not make any statement at all, he could choose to answer some questions and at the same time assert his right not to answer others.

Here, regarding Judge Bakker's testimony from the suppression hearing, the trial court found that

- Judge Bakker is the presiding judge for the Mansfield Municipal Court.

- Judge Bakker conducted the magistrate warnings of McIntyre.

37

- Judge Bakker read and thoroughly explained the statutorily required magistrate warnings to McIntyre.

- Judge Bakker carefully explained the warnings to McIntyre and invited and allowed him to ask questions throughout the process to determine if he understood the warnings and what was happening.

- Judge Bakker wanted to make sure that McIntyre understood she was someone he could trust so that he could communicate any mistreatment or issues to her as a neutral magistrate who is not present on behalf of the police.

- McIntyre did not appear to have any cognitive issues, and appeared to use a vocabulary that, if not elevated, was at baseline with what she thought a sixteen-year-old vocabulary would be.

- McIntyre did not appear to be upset emotionally, was respectful, polite, and communicated effectively.

- McIntyre did not display or articulate any issues such as thirst or hunger and was allowed to use the bathroom.

- McIntyre indicated that he understood his rights and included his initials and signature on the form.

- Judge Bakker had no concerns regarding McIntyre's understanding of the warnings.

- Judge Bakker did not have any concerns regarding the police interviewing McIntyre following her warnings.

- Judge Bakker would not have allowed the police interview to go forward if she had concerns.

- McIntyre did not request an attorney, was not coerced or threatened, and did not request that either the warnings or interview be stopped.

- Judge Bakker also met with McIntyre immediately following the police interview.

- Judge Bakker went through the remaining questions on the form in a thorough manner.

- McIntyre initialed the four corners of the portion of the form where Judge Bakker had marked through indicating that he had not provided a written statement.

- Judge Bakker worked to make sure McIntyre understood that she was there to talk with him and make sure he was okay.

- Despite McIntyre's indication that he had ingested marijuana earlier that day, he did not appear intoxicated.

- Judge Bakker believed that McIntyre understood his rights as explained and had made a voluntary waiver during the police interview and was specifically not mistreated, threatened, or hurt in anyway.

- McIntyre appeared more tired following the police interview and was responsive and respectful but did not appear agitated.

- Judge Bakker would have indicated on the form any concerns she had regarding McIntyre's understanding of his rights following the police interview.

- Judge Bakker determined that McIntyre understood his rights as explained and his actions during the subsequent interview were voluntary.

- Judge Bakker testified credibly.

Regarding Knotts's testimony, the trial court found that

- Knotts was the lead investigator from the Mansfield Police Department on McIntyre's case.

- The police interview was conducted by Hewitt and Vanduzi following McIntyre's arrest in an interview room designated for juvenile interviews in addition to adult, child, witness, and victim interviews.

- McIntyre did not appear to have any medical issues and had not been harassed, coerced, beaten, or threatened in any way before he went into the interview room.

- The interview was accurately and competently recorded with audiovisual equipment.

- Knotts testified credibly.

Each of these facts found by the trial court are consistent with the record and support the trial court's finding that McIntyre gave his statement freely and voluntarily. *See Marsh*, 140 S.W.3d at 910–11 (holding that juvenile defendant's statement was made freely and voluntarily where he received the required magistrate warnings before his statement was recorded, he was informed he could choose not to speak with the detectives, the magistrate's opinion was that defendant's recorded statement was voluntary, and there was no evidence to the contrary); *see also Coffey v. State*, No. 03-01-00342-CR, 2002 WL 437110, at *6 (Tex. App.—Austin Mar. 21, 2002, pet. ref'd) (not designated for publication) (holding that the denial of juvenile's motion to suppress his confession was not an abuse of discretion in prosecution for murder despite allegation that confession was involuntary; evidence supported that statutory safeguards were followed, no evidence supported allegation that confession may have been coerced, defendant's statement that he had been "huffing gas" was contradicted by testimony of officers that they did not smell gasoline in defendant's presence, and no evidence supported defendant's testimony that officer promised him aid of an influential nature). We conclude that the trial court did not err by

40

determining that McIntyre's statement was voluntarily made; thus, we overrule McIntyre's third issue.

## IV. CONCLUSION

Having overruled all three of McIntyre's issues on appeal, we affirm the trial court's judgments.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  January 28, 2021